**Eugene J. BANKS, Plaintiff,**

v.

**Gustav PERSON, et al., Defendants.**

**No. CV 96–5175.**

United States District Court,
E.D. New York.

May 7, 1999.

As Amended May 12, 1999.

Eugene J. Banks, Alden, NY, for pro se.

Eliot Spitzer, New York State Attorney General, by Robert K. Drinan, Assistant Attorney General, Mineola, NY, for defendants.

## MEMORANDUM AND ORDER

WEXLER, District Judge.

Plaintiff Eugene Jon Banks ("plaintiff" or "Banks") commenced this action pursu-ant to 42 U.S.C. § 1983 alleging the use of excessive force in connection with his detention by several parole officers in May of 1992.[1] Presently before the court are defendants' motions for summary judgment. Defendants seek summary judgment as to all claims brought against the New York State Division of Parole on the ground that such claims are barred by the Eleventh Amendment to the United States Constitution. Summary judgment is sought with respect to defendants Person and Lauture on the ground that these defendants had no personal involvement in the alleged deprivation of plaintiff's constitutional rights. Finally, summary judgment is sought as to all defendants on the ground that no question of fact exists concerning the objective reasonableness of the parole officers' conduct and the defendants are therefore entitled to judgment on the ground of qualified immunity. For the reasons set forth below, the motions for summary judgment are granted in all respects.

### BACKGROUND

#### I. The Events of May 1992

Plaintiff's claim arises out of events that transpired on May 20, 1992, when he reported for his monthly visit to his parole officer in the Queens area office of the New York State Division of Parole (the "Queens Office"). The undisputed facts, as gleaned from state court records, testimony at plaintiff's parole revocation hearing and plaintiff's deposition are as follows.

In May of 1992, plaintiff was on parole in connection with prior robbery convictions. On May 20, 1992, Banks reported to the Queens Office, accompanied by his wife, and asked for his parole officer, defendant Lauture. When Lauture came to the reception area to retrieve Banks. Lauture told Banks' wife to remain in the reception area and escorted Banks to

---

1. Prior to the institution of this lawsuit plaintiff commenced a civil rights lawsuit arising out of the same set of facts alleged herein, *see Banks v. Person*, et. al., No. 95–1844. This court dismissed that action with prejudice but granted plaintiff leave to file a new lawsuit that adequately detailed his claim of excessive force. This case represents plaintiff's repleading of the excessive force claim.

Lauture's office. Upon their arrival in Lauture's office, Banks was immediately handcuffed and told to be seated. Parole Officer ("PO") Lauture informed Banks that he was wanted for questioning in connection with a crime in Nassau County and that she would be holding him for the Nassau County police.[2] It is in the recounting of the events that immediately followed Banks' initial handcuffing that the parties' versions of the events, as presented to this court, begin to vary.

According to Banks, upon being told of the reason he was being held, he rose and told Lauture to get a message to Banks' wife who was waiting in the reception area. Banks admits to no conduct that should have provoked the exercise of any force by either Lauture or any other parole officer that subsequently entered the room.

It is Banks' testimony, as developed at his parole revocation hearing as well as at his deposition herein, that the parole officers approached Banks, and without provocation, pushed him and wrestled him to the floor. PO Chapman allegedly put his knee to Banks' chest and kept Banks down in this manner until his legs could be shackled. By Banks' own testimony, this "tussle," or "scuffle," lasted no more than three or four minutes. All use of force ended once Banks was shackled. Banks also testified clearly at this deposition that neither PO Lauture nor PO Person ever touched him during the altercation with the other parole officers. The only time that Lauture ever touched Banks was during his initial handcuffing. PO Person, Lauture's supervisor, was not in the room during the incident.

PO Chapman testified at Banks' preliminary parole revocation hearing. PO Chapman testified that when he entered the room Banks had not only risen from his chair, but was quite agitated, was banging his head against the wall, and told Chap-

man that if he wanted to get Banks he would "have to do him." Chapman testified that he, along with Banks and other parole officers fell to the floor and struggled until Banks was subdued.

Lauture, who testified at Banks' final parole revocation hearing, stated that immediately upon learning that he was being held for questioning, Banks not only got up from his chair, but became agitated and began kicking and jumping. According to Lauture, Banks told her he would have to be shot before he would go to Nassau County. Lauture further testified that after Banks got up from his chair and began kicking and jumping, PO Chapman, Lauture's partner and office mate, entered the room along with PO Rivera and other parole officers.

PO Rivera also testified at Banks' final revocation hearing. Rivera said that he was standing by the door to Lauture's office when he was charged by Banks. Rivera put his hands up to shield himself against Banks. Rivera stated that his thumb was injured when Banks ran against Rivera's hands. Rivera testified that it took four or five parole officers to subdue Banks and place him in leg irons.

Several hours after the incident, Banks was transferred to the Third Precinct of the Nassau County Police Department, located in Williston Park, New York. At that time a form detailing Banks' physical condition was prepared by a police officer who interviewed Banks. The form was reviewed and signed by Banks. This form, known as a "Physical Condition of Defendant Questionnaire" (a "PDCN 79"), was completed for Banks at approximately 5:30 P.M. on May 20, 1992. In response to the question "Have you any injuries?" the PDCN 79 notes Banks' response as "No." In response to a question concerning drug use. Banks stated that he used heroin and needed a doctor for methadone medication.

---

**2.** The crime for which Banks was being held was attempted murder. In connection with that charge. Banks pled guilty to a charge of assault in the first degree. He was subse-

quently sentenced as a prior violent felony offender to an indeterminate term of imprisonment of 4½ to 9 years.

The bottom line of the PDCN 79, signed by Banks, states, "I have read the above questions and answers and I certify that the answers are mine and that they are true." The officer preparing the report noted in the "comments" section of the PDCN 79 that the "defendant appears to be in good health. He has drug habit and requests treatment."

## II. *The Parole Revocation Hearings*

On June 2, 1992, a preliminary hearing before a hearing officer was held in connection with the revocation of Banks' parole. The facts forming the basis for the revocation of Banks' parole are the same facts surrounding the civil rights claim before this court. Specifically, Banks' parole was sought to be revoked on the charge that he failed to follow instructions and posed a danger to himself and others. This charge, like the claim before this court, arose out of the altercation that took place at the Queens Office on May 20, 1992.

In a decision dated June 2, 1992, the hearing officer found that probable cause existed to believe that Banks' conduct on May 20, 1992, violated the terms of his release. The hearing officer based his finding of probable cause on the "credible testimony" of PO Chapman.

Banks' final parole revocation hearing was held on August 24, 1992. Banks, PO Lauture and PO Rivera testified at this hearing, which was held before an Administrative Law Judge ("ALJ"). In his decision, the ALJ sustained the parole violation with which Banks was charged. The ALJ specifically noted that Banks had reacted violently to the parole officers' attempts to detain him for police questioning. The ALJ further stated that "given [Banks'] violent response" to his parole officers' actions, the parole violation should be sustained and assessed Banks for twenty-four months of delinquent time. The decision of the ALJ was subsequently affirmed on administrative appeal.

## III. *State Court Review of the Parole Revocation Decision*

In December of 1992, Banks commenced a proceeding, pursuant to Article 78 of New York's Civil Practice Law and Rules ("CPLR"), to review the final determination of the parole board. Banks' Article 78 petition alleged that Banks was deprived of due process of law, was illegally arrested and "kidnapped by a conspiracy." In a decision dated January 26, 1994, a Justice of the Supreme Court of the State of New York dismissed Banks' Article 78 petition. The state court noted the ALJ's finding that Banks had engaged in behavior threatening to the safety and well-being of others in violation of the terms of his parole. The court held that there was sufficient evidence to substantiate the finding of the ALJ that Banks' violent conduct toward his parole officers warranted a revocation of his parole. In an opinion dated May 31, 1994, the State Court Justice who denied Banks' Article 78 petition denied Banks' application to reargue the January 26, 1994 decision.

## DISCUSSION

### I. *The Motions For Summary Judgment*

As noted, the New York State Division of Parole seeks summary judgment on the ground that plaintiff's claims are barred by the Eleventh Amendment to the United States Constitution. Defendants Person and Lauture seek summary judgment on the ground that they had no personal involvement in the alleged deprivation of plaintiff's constitutional rights. Finally, all defendants seek summary on the ground of qualified immunity. The court considers each motion below.

### II. *Claims Against The New York State Division Of Parole*

 Defendants argue, and plaintiff now concedes, that the claims against the New York State Division of Parole, an arm of the State of New York, are barred by the Eleventh Amendment to the United

States Constitution. *See Pennhurst State School and Hosp. v. Halderman*, 465 U.S. 89, 99–101, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984); *Dube v. State University of New York*, 900 F.2d 587, 595 (2d Cir.1990), *cert. denied*, 501 U.S. 1211, 111 S.Ct. 2814, 115 L.Ed.2d 986 (1991). Accordingly, the court grants the motion for summary judgment as to the New York State Division of Parole.

### III. Claims Against Parole Officers Lauture and Persons

A claim for a violation of constitutional rights cannot be based upon the doctrine of *respondeat superior*. *See, e.g., Collins v. City of Harker Heights*, 503 U.S. 115, 121–23, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992); *Hemmings v. Gorczyk*, 134 F.3d 104, 108 (2d Cir.1998). To establish liability, plaintiff must show some personal involvement of the defendant in the alleged deprivation of rights. *See McKinnon v. Patterson*, 568 F.2d 930, 933–34 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978), *Erwin v. Russi*, 1998 WL 474096 at *5 (S.D.N.Y. August 11, 1998).

Here, according to Banks' own clear testimony, there was absolutely no personal involvement on the part of defendants Lauture or Person. Banks has clearly testified that although Lauture was in the room when the scuffle ensued, she took no part in restraining Banks. Person, a senior parole official at the Queens Office, was not even in PO Lauture's office during the incident. In view of the foregoing, neither Lauture nor Person can be held liable in connection with Banks' claim of excessive force. Accordingly, defendants Lauture and Person are entitled to summary judgment.[3]

**3.** To the extent that plaintiff alleges any claim against Lauture or Person in connection with the legality of his arrest, this court has previously held that the legality of plaintiffs' arrest

### IV. The Remaining Claims: Qualified Immunity

In view of the foregoing rulings, the only claim remaining is the claim of excessive force against defendant parole officers Chapman and Rivera. Each of these defendants is alleged to have used excessive force in connection with the scuffle that occurred at the Queens Office on May 2, 1992. With respect to this claim, defendants Chapman and Rivera seek summary judgment on the ground of qualified immunity.

#### A General Principles.

A law enforcement officer seeking summary judgment on the ground of qualified immunity bears the burden of proving that it was "objectively reasonable" for the defendant to believe that his behavior did not violate plaintiff's clearly established constitutional rights. *Lennon v. Miller*, 66 F.3d 416, 418 (2d Cir.1995) (quoting, *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). The objective reasonableness standard was established to "permit the resolution of many insubstantial claims on summary judgment." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *see Mozzochi v. Borden*, 959 F.2d 1174, 1177 (2d Cir.1992).

Objective reasonableness is established where " 'officers of reasonable competence could disagree' as to the legality of the defendant's actions." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). An officer's actions will be found objectively unreasonable, and summary judgment will be denied only if "no officer of reasonable competence could have made the same choice in similar circumstances." *Lennon*, 66 F.3d at 420–421; *see, e.g., Santiago v. Semenza*, 965 F.Supp. 468, 473 (S.D.N.Y.1997) (granting summary judgment on ground of qualified im-

has been established by his conviction and any such claim may not be pursued in this proceeding.

munity on excessive force claim); *Steiner v. New York*, 920 F.Supp. 333, 339 (E.D.N.Y.1996) (granting summary judgment on claim of lack of probable cause to arrest).

A defendant seeking summary judgment need not show that all reasonable police officers would have acted similarly under the circumstances presented, but only that reasonable officers might disagree as to the legality of the defendant's conduct under the circumstances. If this court determines that the only conclusion that a rational jury could reach is that reasonable officers might differ as to the propriety of defendant's conduct, summary judgment should be granted. *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 569 (2d Cir. 1996).

■ Disputes over whether conduct is reasonable are usually questions of fact for juries. Where, however, "the factual record is not in serious dispute ... the ultimate legal determination whether ... a reasonable police officer should have known he acted unlawfully is a question of law better left for the court to decide." *Warren v. Dwyer*, 906 F.2d 70, 76 (2d Cir.), *cert. denied*, 498 U.S. 967, 111 S.Ct. 431, 112 L.Ed.2d 414 (1990).

■ The right to be free of excessive force is a right that was clearly established at the time of the May 1992 incident. *See Graham v. Connor*, 490 U.S. 386, 393–93, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *Posr v. Doherty*, 944 F.2d 91, 95 (2d Cir. 1991). Nonetheless, defendants are entitled to qualified immunity if it was objectively reasonable for them to believe that their conduct at the Queens Office did not violate this right. More specifically, defendants must show that reasonable officers would disagree as to the propriety of defendants' conduct. If some reasonable officers would agree that Chapman and Rivera had acted appropriately under the circumstances, defendants are entitled to summary judgment.

■ Courts analyze Fourth Amendment claims of excessive force under a reasonableness standard. The court evaluates the reasonableness of the force used by considering the totality of the circumstances known to the officer at the time of the challenged conduct. *Lowth*, 82 F.3d at 567. The court looks to factors such as the need for the use of force, the relationship between the need for force and the amount of force used, the extent of any injury and whether the force was applied "maliciously and sadistically." *Santiago v. Semenza*, 965 F.Supp. 468, 471 (S.D.N.Y. 1997) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865 (quoting, *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)). With these principles in mind, the court turns to plaintiff's claims and the defendants' qualified immunity defense.

### B. *The Use Of Force*

With regard to the degree of force used, the court notes that no party disputes that the entire altercation lasted no more than three or four minutes. It is clear that Banks and the parole officers involved (including defendants Chapman and Rivera) ended up on the floor of the office and that leg shackles were applied. For purposes of this motion the court will credit Banks' testimony that for a short period of time one of the officer's knees was on Banks' chest. All parties agree that once leg shackles were applied, the use of force ceased.

There is no evidence that Banks suffered any injury requiring medical attention. As noted above, Banks signed the PDCN 79 form indicating that he was not injured in any way. When asked if he needed medical attention, Banks referred only to his heroin habit and a need for

methadone. Surely, if there were any other need for medical attention, Banks would have come forward at that time and sought appropriate attention.

### C. Banks' Conduct At The Queens Office

Weighed against the use of force referred to above is the totality of the circumstances precipitating the scuffle in the Queens Office. No party disputes that shortly after Banks was told that he was being held for questioning by Nassau County police, he rose from his chair. It is also undisputed that at the moment that he rose from his seat there was no one in the room except for Lauture and Banks. There is, therefore, no dispute that Banks was standing when Chapman and the other parole officers entered the room.

If Banks' current version of the events is true, i.e., that he did absolutely nothing to provoke the scuffle, all reasonable officers might agree that any use of force was excessive and the claim of qualified immunity might fail. However, this is not the first time that the facts surrounding the May 1992 incident have been litigated. Indeed, it was the precise set of facts presented herein that were litigated in connection with Banks' parole revocation hearing. The question arises, then, whether Banks' earlier litigation of these facts precludes re-litigation of the facts in the context of this civil rights action. To determine the preclusive effect of facts found in the course of the parole revocation hearing, the court turns to consider the application of collateral estoppel to this case.

### V. Collateral Estoppel: General Principles

The doctrines of res judicata and collateral estoppel apply to civil rights lawsuits brought pursuant to 42 U.S.C. § 1983. Allen v. McCurry, 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980); Gill v. Stella, 845 F.Supp. 94, 100 (E.D.N.Y. 1994). Collateral estoppel, also known as issue preclusion, is applied to protect liti-

gants from multiple lawsuits and to conserve judicial resources. The doctrine "fosters reliance on judicial action by minimizing the possibility of inconsistent decisions." Remington Rand Corp. v. Amsterdam–Rotterdam Bank, N.V., 68 F.3d 1478, 1485 (2d Cir.1995) (quoting Montana v. United States, 440 U.S. 147, 153–54, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979)). Pursuant to 28 U.S.C. § 1738, federal courts apply the state law of collateral estoppel when determining the preclusive effect of a state court decision. Migra v. Warren City School District Bd. Of Educ., 465 U.S. 75, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984); Johnson v. Watkins, 101 F.3d 792, 794 (2d Cir.1996).

Under New York law, collateral estoppel will preclude re-litigation of an issue if the issue sought to be precluded is identical to the issue in the second proceeding and is one which has necessarily been decided in the prior proceeding in the context of a full and fair opportunity to litigate. Colon v. Coughlin, 58 F.3d 865, 869 (2d Cir.1995); Caridi v. Forte, 967 F.Supp. 97, 100 (S.D.N.Y.1997), see Capital Telephone Co. v. Pattersonville Telephone Co., 56 N.Y.2d 11, 17–18, 451 N.Y.S.2d 11, 436 N.E.2d 461 (1982); Schwartz v. Public Administrator, 24 N.Y.2d 65, 71, 298 N.Y.S.2d 955, 246 N.E.2d 725 (1969). The party seeking preclusion bears the burden of showing the identity of issues while the party against whom collateral estoppel is asserted bears the burden of showing the absence of a full and fair opportunity to litigate. Colon, 58 F.3d at 869; Quartararo v. Catterson, 917 F.Supp. 919, 944 (E.D.N.Y.1996); Capital Tel., 56 N.Y.2d at 18, 451 N.Y.S.2d 11, 436 N.E.2d 461.

The Second Circuit has held that res judicata and collateral estoppel principles apply to New York state court proceedings brought pursuant to Article 78 of the CPLR. See, e.g., Collard v. Incorporated Village of Flower Hill, 759 F.2d 205, 206–07 (2d Cir.1985); Genova v. Town of Southampton, 776 F.2d 1560, 1561 (2d Cir.

1985) (per curiam); *Trammell v. Coombe,* 1997 WL 525478 at *6 (S.D.N.Y. August 21, 1997). Moreover, as noted, collateral estoppel may be applied in a civil rights lawsuit to preclude re-litigation of facts found in an earlier proceeding. Indeed, federal courts have held that excessive force claims may be barred by collateral estoppel.

In *Caridi v. Forte,* 967 F.Supp. 97 (S.D.N.Y.1997), the federal court gave preclusive effect to a prior state court factual finding and granted defendants summary judgment. There, the court held that plaintiff could not state a claim for a civil rights lawsuit based on the alleged use of excessive force where he had previously been convicted in a state court proceeding of resisting arrest. *See also Pastre v. Weber,* 717 F.Supp. 987, 991 (S.D.N.Y. 1988) (giving preclusive effect to conduct forming basis of resisting arrest charge). *Leftwich v. Fox,* 556 F.Supp. 390, 392 (S.D.N.Y.1983) (barring Fourth Amendment claim for unlawful seizure based upon factual finding of state court suppression hearing).

Courts have not been hesitant to afford collateral estoppel effect to findings of fact made in the context of parole revocation hearings and affirmed on appeal in state court Article 78 proceedings. Directly on point is *Gill v. Stella,* 845 F.Supp. 94 (E.D.N.Y.1994). There, the defendant parole officers sought collateral estoppel effect with respect to findings made at plaintiff's previous parole revocation hearings. In *Gill,* as here, plaintiff litigated issues in the context of preliminary and final parole revocation hearings as well as subsequent Article 78 proceeding.

The issues sought to be precluded in *Gill* were allegations that Gill had been denied due process of law at his parole revocation hearing and that the charges brought against him had been fabricated by his parole officers. The federal court, applying collateral estoppel in Gill's subsequent civil rights action, held that the state court's findings that the parole officers acted upon probable cause and that the parole violations charges were not fabricated were entitled to preclusive effect. Acceptance of these facts as true in the context of Gill's civil rights claim led to a grant of summary judgment for the parole officer defendants with respect to the claim of lack of probable cause to charge plaintiff with a parole violation. *See Gill,* 845 F.Supp. at 100–01. *Accord Erwin v. Russi,* 1998 WL 474096 at *4 (August 11, 1998) (collateral estoppel barred civil rights claim based upon lack of probable cause to find a parole violation where parole revocation hearings and subsequent state appeal found that probable cause existed); *Rullo v. Rodriguez,* 604 F.Supp. 366, 370 (S.D.N.Y.1985) (giving collateral estoppel effect to facts found at parole revocation and subsequent state habeas corpus proceeding). *Accord People v. Hilton,* 179 Misc.2d 538, 546, 686 N.Y.S.2d 581, 587 (1999) (preclusive effect afforded to facts found at a parole violation hearing).

■ Having found that this court may apply collateral estoppel to facts found during the course of Banks' parole revocation proceedings, the court turns to consider whether the findings of the state court with respect to Banks' conduct at the Queens Office should be given preclusive effect.

### A. *Identity Of Issue*

The ultimate issue that was decided at Banks' parole revocation hearing was whether he had violated the terms of his parole. The specific charge that was litigated was whether or not, on May 20, 1992, Bank resisted arrest, failed to follow instructions and posed a danger to himself and other individuals.

Sustaining the parole violation, the ALJ found that Banks "acted violently to the attempt to detain him for police questioning." The ALJ further held that the only appropriate action to take in Banks' case "given [his] violent response to his PO's actions," was to sustain the parole violation.

In the context of Banks' Article 78 proceeding, the court noted that the ALJ found that Banks "acted in a dangerous manner" and that his behavior violated the term of his parole that prohibited behavior threatening to the safety and well-being of others. Affirming the revocation of parole, the state court held that the testimony of the parole officers was sufficient to support the parole board determination that Banks violated the aforementioned condition of his parole.

In view of the foregoing, it is clear that the issue of Banks' conduct just prior to the scuffle at the Queens Office was the issue litigated in Banks' parole revocation litigation. That issue is the precise issue for that defendants seek to bar Banks from re-litigating. Accordingly, the court holds that there is an identity of issues between the issue for which preclusive effect is sought and the issue decided in the state court proceeding. Having found that there is an identity of issues between an issue litigated at the parole revocation hearings and the issue for which preclusion is sought, the next question is whether the finding on the issue was necessary to the prior judgment.

### B. *Necessary To The Proceedings*

The basis of the parole violation charge was that Banks endangered himself and others by resisting his parole officers' attempts to detain him at the Queens Office on May 20, 1992. Given the nature of the charge, a finding that Banks had acted dangerously on May 20, 1992 was clearly necessary to the ultimate determination that Banks violated a term of his parole. Had the ALJ found otherwise, the parole violation could not have been sustained. Accordingly, the court finds that factual findings concerning Banks' conduct at the Queens Office on May 20, 1992 were necessary to the judgment sustaining Banks'

parole revocation. The final issue to be decided in determining whether Banks should be precluded from re-litigating the issue of his conduct prior to the Queens Office scuffle is whether Banks had a full and fair opportunity to litigate this issue in the prior forum.

### C. *Full And Fair Opportunity To Litigate*

The New York Court of Appeals has set forth the factors to consider when determining whether there has been a full and fair opportunity to litigate an issue. Specifically, the court should consider, the nature of the forum and the importance of the claim in the prior litigation. The court also considers the incentive to litigate, the competence of counsel, the availability of new evidence and any differences in the applicable law and the foreseeability of future litigation. *See Ryan v. New York Tel. Co.*, 62 N.Y.2d 494, 500, 478 N.Y.S.2d 823, 467 N.E.2d 487 (1984).

The prior forum here was a parole revocation hearing. As indicated, this hearing consisted of a three step process. The preliminary hearing, the final hearing and appeal to the New York State Supreme Court by way of a proceeding brought pursuant to Article 78 of the CPLR. Banks attended both the preliminary and final parole revocation hearings. The preliminary hearing was before an hearing officer and was held to determine if there was probable cause to believe that Banks had violated the terms of his parole. The final parole revocation hearing was held before and ALJ. At each hearing Banks testified and was represented by counsel who had the opportunity to call and cross-examine witnesses.[4]

The burden of proof at parole revocation hearings is the same burden of proof applicable in this civil case. Thus, in the context of a parole violation, the parole

---

4. Banks' counsel also had the right to subpoena witnesses to testify at Banks' parole revocation hearings. The record reflects that counsel's efforts to subpoena Banks' wife were unsuccessful. Because the record is

clear that Banks' wife was not in the room during the altercation, the court holds that the inability to obtain the testimony of Mrs. Banks at the revocation hearing does not un-

authorities have the burden of proving misconduct by a preponderance of the evidence. *People v. New York State Division of Parole,* 168 Misc.2d 937, 646 N.Y.S.2d 611, 613 (1996), *app. dismissed,* 251 A.D.2d 43, 672 N.Y.S.2d 722 (1st Dep't 1998). Based on the foregoing, the court holds that the nature of the parole revocation proceedings, including the availability of counsel, witnesses, and a hearing before an ALJ, militates in favor of giving the prior factual finding preclusive effect.

With respect to the question of Banks' incentive to litigate in the first forum, the court notes that Banks' incentive to vigorously litigate the propriety of his parole revocation was high. If the violation was sustained, Banks' liberty was at stake. Despite the fact that Banks was subsequently sentenced to a further term of imprisonment. Banks certainly had a great incentive to litigate the issue of his parole violation vigorously.

Other factors militating in favor of a finding that Banks had a full and fair opportunity to litigate his parole revocation are the availability of competent counsel (who was familiar with the case and represented Banks at both his preliminary and final hearings) and witnesses at the prior hearing. Indeed, the witnesses who would be called to testify at his civil rights case are precisely the same individuals who testified and were cross-examined at Banks' parole revocation hearings.

Based upon the foregoing, the court holds that Banks had a full and fair opportunity to litigate the issue of his conduct at the Queens Office on May 20, 1992 in the context of his parole revocation hearings. Accordingly, the court holds that collateral estoppel must be applied to the facts found therein. This holding is in accord with previously cited cases holding that facts found in connection with a New York State Article 78 proceeding may be given collateral estoppel effect. *E.g., Collard,* 759 F.2d at 206–07; *Genova,* 776 F.2d at 1561; *Trammell v. Coombe,* 1997 WL 525478 at *6 (S.D.N.Y. August 21, 1997).

dermine the finding that there was a full and

## VI. *Excessive Force And Objective Reasonableness*

■ Having found that Banks cannot re-litigate the factual issue of his conduct at the Queens Office on May 20, 1992, the court turns to consider the claim of qualified immunity under these established facts. As noted, the state court specifically found that Banks acted "dangerously" and "violently" when his parole officers attempted to detain him for questioning on May 20, 1992. The question then, is whether the conduct of the parole officers was "objectively reasonable" to restrain Banks who was acting in a dangerous and violent manner.

As noted above, the conduct alleged to have amounted to excessive force consisted of a scuffle that all parties agree lasted no more than three or four minutes. At worst, Banks was wrestled to the ground and one of the parole officers placed his knee in Banks' chest while leg shackles were applied. Banks complained of no injury at the time of the altercation and never sought any medical attention. Given the fact that Banks' dangerous and violent behavior precipitated the scuffle, the court holds, as a matter of law, that reasonable officers could certainly differ as to the propriety of the parole officers' actions in subduing Banks. Certainly, there are reasonable officers who would agree that the officers here acted properly and did not exercise force so excessive as to violate the United States Constitution.

Because reasonable officers would clearly have acted similarly to the defendants herein, the court holds that the conduct of defendants was objectively reasonable under the circumstances and the officers are therefore entitled to qualified immunity. Accordingly, the court grants defendants Chapman and Rivera summary judgment on the claim of qualified immunity.

## CONCLUSION

For the reasons stated herein, the New York State Division of Parole is granted

fair opportunity to litigate in that forum.

summary judgment on Eleventh Amendment grounds. Defendants Person and Lauture are granted summary judgment on the ground that they had no personal involvement in the alleged deprivation of constitutional rights. These defendants, along with defendants Chapman and Rivera are also granted summary judgment on the ground of qualified immunity. All defense motions for summary judgment are granted. The Clerk of the Court is directed to close the file in this case.